UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

YUDY HERNANDEZ,                                    CASE NO.

      Plaintiff,

vs.

THEORY OF NEW YORK LLC, a Foreign Limited
Liability Company D/B/A THEORY

      Defendant.

_____/

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF, AND JURY TRIAL DEMAND

Plaintiff, YUDY HERNANDEZ, through undersigned counsel, sues Defendant, THEORY OF NEW YORK LLC, a foreign limited liability company d/b/a THEORY (hereinafter referred to as "THEORY"), for declaratory and injunctive relief, and damages, and alleges as follows:

This action is brought under Title III of the Americans with Disabilities Act ("ADA"), that is codified in 42 U.S.C. §§12181-12189.

1)     This action is also brought pursuant to 28 C.F.R. Part 36.

2)     This Court has jurisdiction over this case based on federal question jurisdiction, as provided in 28 U.S.C. §1331 and the provisions of the ADA.

3)     Furthermore, because this Court has jurisdiction over the ADA claim, the Court has supplementary jurisdiction over Plaintiff's common law tort claim pursuant to 28 U.S.C. §1367.

4)     Plaintiff is sui juris, and she is disabled as defined by the ADA and ADA Amendments Act of 2008, 42 U.S.C. §12101 ("ADAAA").

5)     Plaintiff seeks declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

6)      Plaintiff desires to prevent discrimination and demands equal access to Defendant's internet website to purchase a shirt.

7)      Plaintiff also seeks declaratory and injunctive relief for trespass against the Plaintiff's computer.  The computer is Plaintiff's personal property, and a claim for trespass attached to same.

8)      The Defendant is also liable for compensatory damages to Plaintiff as a result of the trespass to Plaintiff's personal property.

9)      The remedies provided under common law for trespass are not exclusive, and same may be sought in connection with suits brought under the ADA.

10)      Venue is proper in the Southern District of Florida, Miami-Dade Division, since all events, actions, injuries, and damages complained of herein occurred in the Southern District of Florida.

11)      Furthermore, Plaintiff is a resident of Miami-Dade County which falls within the Miami Division of the Southern District of Florida.

12)      At all relevant times, Plaintiff is and was visually impaired and has rhegmatogenous retinal detachment of the right eye, proliferative vitreoretinopathy that developed as a complication of her rhegmatogenous retinal detachment and prevents the successful surgical repair of her retina, aphakia, band keratopathy, and ocular hypertension that substantially impairs Plaintiff's vision.

13)      Plaintiff's visual impairment interferes with her day-to-day activities and causes limitations in visualizing her environment.  As such, Plaintiff is a member of a protected class under the ADA, 42 U.S.C. § 12102(1) - (2), the regulations implementing the ADA set forth at 28 CFR §§ 36.101, et seq., and in 42 U.S.C. 3602, §802(h).

14)      In addition, Plaintiff is an advocate of the rights of similarly situated disabled persons. As such is a "tester" for the purposes of asserting her civil rights and monitoring, ensuring, and determining whether places of public accommodation and/or their respective and associated

2

websites are in compliance with the ADA and any other applicable disability laws, regulations, and ordinances.

15)     Plaintiff is limited in the performance of major life activities due to her visual disability and she requires assistive technologies, auxiliary aids, and services for effective communication, including communication in connection with her use of a computer.

16)     Plaintiff uses the computer regularly, but due to her visual disability, Plaintiff cannot use her computer without the assistance of appropriate and available auxiliary aids, screen reader software, and other technology and assistance. In order to assist her, Plaintiff uses ChomeVox screen reader software that is readily available commercially. As background, screen reader software translates the visual internet into an auditory equivalent.  The software reads the content of a webpage to the user at a rapid pace.

17)     "The screen reading software uses auditory cues to allow a visually impaired user to effectively use websites. For example, when using the visual internet, a seeing user learns that a link may be 'clicked,' which will bring her to another webpage, through visual cues, such as a change in the color of the text (often text is turned from black to blue). When the sighted user's cursor hovers over the link, it changes from an arrow symbol to a hand. The screen reading software uses auditory -- rather than visual -- cues to relay this same information. When a sight impaired individual reaches a link that may be 'clicked on,' the software reads the link to the user, and after reading the text of the link says the word 'clickable.'…Through a series of auditory cues read aloud by the screen reader, the visually impaired user can navigate a website by listening and responding with her keyboard." *Andrews v. Blick Art Materials, LLC, 17-CV-767, 2017 WL 6542466, at \*6-7 (E.D.N.Y. Dec. 21, 2017)*.

18)    Plaintiff frequently accesses the internet. Because she is significantly and permanently visually disabled, to effectively communicate and comprehend information available on the internet and thereby access and comprehend websites, Plaintiff uses commercially available screen reader software to interface with the various websites.

19)    Defendant, THEORY, is a foreign limited liability company authorized to do business and doing business in the State of Florida.

20)    Defendant, THEORY, is a company that sells men, and women clothing, and accessories. There is a retail location in Miami-Dade County.

21)    At all times material hereto, Defendant was and still is a private entity which owns and operates retail locations under the brand name "THEORY".  The stores are open to the public, and each of Defendant's locations is defined as a "public accommodation" within the meaning of Title III of the ADA because Defendant is a private entity which owns and/or operates "[A] bakery, grocery store, clothing store, hardware store, shopping center, restaurant, or other sales or rental establishment," per 42 U.S.C. §12181(7)(E) and 28 C.F.R. §36.104(2).

22)    Because Defendant is a store open to the public, each of Defendant's physical stores is a place of public accommodation subject to the requirements of the ADA, 42 U.S.C. §12182, §12181(7)(B), and its implementing regulations, 28 C.F.R. Part 36.

23)    At all times material hereto, Defendant was and still is an organization owning and operating the website located at https://www.theory.com/. Since the website is open through the internet to the public as an extension of the retail stores, by this nexus the website is an intangible service, privilege and advantage of Defendant's brick and mortar locations, the Defendant has subjected itself and the associated website it created and maintains to the requirements of the ADA. The website also services Defendant's physical stores by providing information on its brand and

other information that Defendant is interested in communicating to its customers about its physical locations.

24)     Since the website allows the public the ability to view the products available at Defendant's locations, purchase products, through Defendant's website, subscribe to Defendant's newsletter, create an account and register to track orders, create a wish list, and learn the story behind Defendant's brand, the website is an extension of, and gateway to, Defendant's physical stores which are places of public accommodation pursuant to 42 U.S.C. § 12181(7)(E). By this nexus between Defendant's retail store locations and the Website, and the fact that the Website clearly provides support for and is connected to Defendant's stores for its operation and use, the Website is an intangible service, privilege, and advantage of Defendant's brick-and-mortar stores that must comply with all requirements of the ADA.  The Website must not discriminate against individuals with disabilities, and must not deny those individuals the same full and equal access to and enjoyment of the goods, services, privileges, and advantages as afforded the non-visually disabled public both online and in the physical stores, which are places of public accommodations subject to the requirements of the ADA.

25)     Plaintiff sought to, seeks to and intends to patronize, in the near future once the Website's access barriers are removed or remedied, one or more of Defendant's physical retail locations, check store hours and product pricing and place online orders. In the alternative, Plaintiff intends to monitor the Website in the near future as a tester to ascertain whether it has been remedied and updated to interact properly with screen reader software.

26)     Traveling outside of her home as a visually disabled individual is often a difficult, hazardous, frightening, frustrating, and confusing experience, thus the opportunity to shop and pre-shop Defendant's products, plan her visits, and to compare products, services, prices, sales,

discounts, and promotions are important and necessary accommodations for Plaintiff because Defendant has not provided its business information in any other digital format that is accessible for use by blind and visually disabled individuals using screen reader software.

27)    During the month of August 2025, Plaintiff attempted on a number of occasions to utilize the Website to browse through the merchandise and online offers to educate herself as to the merchandise, sales, discounts, and promotions being offered, learn about the brick-and-mortar location, check store hours, and check product pricing with the intent to make a purchase through the Website or in one of the physical locations and with the intent to make a purchase through the website or at one of Defendant's physical stores.  Plaintiff also attempted to access and utilize the Website in her capacity as a tester to determine whether it was accessible to blind and visually disabled persons such as herself who use screen reader software to access and navigate company websites.

28)    Plaintiff utilized ChromeVox ("Screen Reader Software") that allows individuals who are blind and visually disabled to communicate with websites. However, Defendant's Website contains access barriers that prevent free and full use by blind and visually disabled individuals using keyboards and available screen reader software. Plaintiff attempted to purchase a shirt on Defendant's website.  However, the Plaintiff was not able to freely and fully use Defendant's website because it contains access barriers that make it inaccessible to persons with disabilities, and for which there is no reasonable accommodation for the Plaintiff.

29)    Defendant's Website contains access barriers that prevent free and full use by blind and visually disabled individuals using keyboards and available screen reader software. These barriers are pervasive and include, but are not limited to:

    **Theory**  https://www.theory.com/

System settings while doing the review:

Operating system: Windows 11

Browser: Google Chrome v. 138.0.7204.101

Screen Reader: NVDA v. 2025.1.2.36913

Video Recorder: OBS Studio 31.0.4

**Summary of Barriers (9)**

Our evaluation of the Theory.com homepage revealed several accessibility challenges that may significantly impact users who rely on screen readers, keyboard navigation, or other assistive technologies. While this review focused only on the homepage, the patterns observed suggest that similar barriers may exist on other pages throughout the site.

Two key themes emerged during our assessment:

1. Challenges with the Accessible Navigation Menu

At the beginning of the user journey, an "accessible menu" is offered, likely provided by a third-party accessibility overlay. While it appears to support accessible navigation, its behavior is inconsistent with user expectations. For example, pressing Enter or Space on top-level menu items such as "New Arrivals" or "Women" causes full-page navigation rather than expanding a submenu. The actual control for expanding these categories is revealed only later in the tab order as a "toggle submenu" button, which is not visible until the user tabs to it.

If users miss or skip this menu, they are left to navigate the primary menu, which presents further difficulties. Some links (like "Linen" and "Editorial") are skipped in the focus

order, and many elements lack visible focus indicators. This combination creates confusion and increases the chance that users may miss critical content or navigation pathways.

2. Limited Accessibility in Promotional Carousels

The homepage includes two "accessible carousels" that present issues with both content delivery and keyboard interaction.

In the first carousel, the screen reader announces "Slide 1 of 1" and a "Next Slide" button, suggesting additional slides are available — but pressing the button results in no change. Additionally, promotional text like "END OF SEASON SALE" and other visual content is not conveyed to screen reader users, and the central image appears as a black box with no descriptive alternative text.

The second carousel contains multiple slides, but important product details, including names, prices, and discounts — are not conveyed when the content changes. The screen reader announces only the slide number. After using navigation buttons, the user is directed first to controls like "Add to Wishlist" before learning what product is on the slide, and the focus sequence does not return them to updated slide content in a logical manner.

Several promotional sections below the carousel, including Summer, Captured, Women's Best Sellers, Men's Best Sellers, Bottom Line, and Elegant Dresses, also lack descriptive text and visible focus indicators. These visuals are prominent and clearly intended to guide user engagement, yet their lack of accessible context limits who can meaningfully interact with them.

Key Accessibility Themes Identified:

Unintuitive navigation menu behavior that can prevent access to submenu items

Focus order issues in both menus and carousels that disrupt expected interaction patterns

Missing or unclear screen reader announcements for slide content and promotional messaging

Lack of visible focus indicators across many interactive homepage elements

No alternative text or labeling for key visuals and banners

These issues can cause confusion, create barriers to product discovery, and limit access to promotions and navigation.

**Violation 1: 1.3.1 Info and Relationships**

Information, structure, and relationships conveyed through presentation can be programmatically determined or are available in text.

Description: When users begin navigating the page, an accessible navigation menu is offered, likely generated by AudioEye. The screen reader announces top-level categories such as "New Arrivals," "Women," and "Linen." However, pressing Enter or Space on any of these does not open a submenu, instead, it loads a new page. Only by tabbing further can the user reach a hidden control announced as "toggle sub menu button collapsed New Arrivals," which is the actual interactive element for expanding the menu.

Real-World Impact: This creates significant confusion for keyboard and screen reader users. The expected behavior for menu headers is to expand and show submenu items, not trigger navigation. Since only one hidden control per header allows submenu expansion, users may miss entire sections unless they know the workaround, undermining the accessibility intent of the plugin.

Applicable WCAG 2.1 Standard at Issue: 1.3.1 Info and Relationships (Level A)

URL Where Issue Was Encountered:

https://www.theory.com/

Screen Capture Evidence:

https://askbizit.sharepoint.com/:v:/s/ADA/EavTxI0X9DlFvd04pzjxoswBu01ljxpukku9p0
ws--kjtQ

**Violation 2: 2.4.7 Focus Visible**

Any keyboard operable user interface has a mode of operation where the keyboard focus
indicator is visible.

Description: After closing the promotional banner on the Theory homepage, the screen
reader announces a "Skip to Main Content" link. However, this link is not visually visible
when it receives focus. It appears to be styled off-screen with no styling rules to display it
on focus.  Real-World Impact: Sighted keyboard users cannot benefit from this important
bypass mechanism. They are forced to manually tab through all header and menu
elements, adding unnecessary friction to navigation, especially for users with motor
impairments or screen magnifiers.

Applicable WCAG 2.1 Standard at Issue: 2.4.7 Focus Visible (Level AA)

URL Where Issue Was Encountered:

https://www.theory.com/

Screen Capture Evidence:

https://askbizit.sharepoint.com/:v:/s/ADA/Ec6H_v7xkWxEsd-
MKU1gs_0BcJ3kx_icMOIRU2_Yh-uKdQ

**Violation 3: 2.4.3 Focus Order**

If a Web page can be navigated sequentially and the navigation sequences affect meaning or operation, focusable components receive focus in an order that preserves meaning and operability.

Description: When the accessible menu is not opened, and the user continues navigating through the standard navigation bar on the homepage, the focus order skips over the "Linen" and "Editorial" navigation items entirely. These items are visually present but not reachable by keyboard tabbing, meaning the user cannot access them unless they use a screen reader or mouse.  Real-World Impact: This broken sequence traps keyboard users in an incomplete navigation experience, preventing them from reaching certain sections of the site. For users with motor impairments or those who navigate using tab keys only, this creates a significant barrier to accessing important product categories.

Applicable WCAG 2.1 Standard at Issue: 2.4.3 Focus Order (Level A)

URL Where Issue Was Encountered:

https://www.theory.com/

Screen Capture Evidence:

https://askbizit.sharepoint.com/:v:/s/ADA/EcwEkaqoyW9Kh9B4I5L_rPoBYr78J0nhpFS7wtrrfMI3JQ

**Violation 4: 2.4.7 Focus Visible**

Any keyboard operable user interface has a mode of operation where the keyboard focus indicator is visible.

Description: If a user does not open the accessible menu offered upon beginning navigation, they are forced to use the standard interface to explore the site. On the Theory homepage, many key interactive elements lack visible focus indicators when navigated with a keyboard. These include:  Left navigation items like New Arrivals, Women, and Men,  Right-side options like Wishlist and the cart icon,  The Theory logo, which acts as a link to the homepage,  And the slide-up promotional banner (header-banner slide-up) with links like Download and its Close button (X).  Although these elements receive focus and are announced by screen readers, no visible styling appears to help users track their current position.  Real-World Impact: Keyboard users, including those with motor disabilities, are left disoriented and unaware of where they are while navigating. This increases the risk of missed actions or duplicated inputs and forces users to rely solely on memory or a screen reader to track progress, which undermines efficient site exploration.

Applicable WCAG 2.1 Standard at Issue: 2.4.7 Focus Visible (Level AA)

URL Where Issue Was Encountered:

https://www.theory.com/

Screen Capture Evidence:

https://askbizit.sharepoint.com/:v:/s/ADA/ERlejSt3Aq9GuKY4TdZV93UBzSeeP_rhpzq Ymv8FyXz7MQ

**Violation 5: 1.3.1 Info and Relationships**

Information, structure, and relationships conveyed through presentation can be programmatically determined or are available in text.

Description:  After the user exits the header section on the homepage, a so-called "accessible carousel" is announced by the screen reader. It indicates "Slide 1 of 1" and includes a "Next slide" button, suggesting that multiple slides can be browsed. However, pressing the button does not load any new content, and no feedback is provided. This misleading structure causes confusion and wastes time as the user believes new content is available when it is not.  The carousel also includes visual promotional text : "END OF SEASON SALE" and "Extra 20% Off Sale*" which is not announced by the screen reader. The image placeholder in the center of the carousel appears as a large black box with no alternative text or labeling. There is no product name, description, or any context about what is being promoted. The only items announced are two links, "Shop Women" and "Shop Men," but these are disconnected from any promotional explanation and appear without context.  Real-world impact: Screen reader users are misled into navigating a carousel that appears interactive but offers no new content. They are given no indication of what the visual elements convey and are unable to understand the purpose or value of the promotion. This causes disorientation, frustration, and a lack of access to marketing or product information that is visible to sighted users.

Applicable WCAG 2.1 Standard at Issue: 1.3.1 Info and Relationships (Level A)

URL Where Issue Was Encountered:

https://www.theory.com/

Screen Capture Evidence:

https://askbizit.sharepoint.com/:v:/s/ADA/EffmIGwRO_5AvaqoeCFyB5gBd4eHuJYgfD ZBdF-2zfwX4Q

**Violation 6: 2.4.7 Focus Visible**

Any keyboard operable user interface has a mode of operation where the keyboard focus indicator is visible.

Description: Across several homepage promotional sections, including "Summer, Captured," "Women's Best Sellers," and "Men's Best Sellers," none of the links or interactive elements provide a visible focus indicator when navigated with a keyboard. This includes:  The "Women's New Arrivals" and "Men's New Arrivals" buttons in the "Summer, Captured" section  "Shop Now" links in both Best Sellers sections  The promotional images and banners that surround these links  As a result, the user cannot visually track where they are on the page when tabbing through content.  Real-World Impact: Keyboard-only users, including individuals with motor disabilities or who rely on assistive tech, cannot tell which element is currently in focus. This leads to disorientation and makes it easy to miss important navigation points or promotional links, disrupting the flow of browsing and impairing the ability to shop or explore the site efficiently.

Applicable WCAG 2.1 Standard at Issue: 2.4.7 Focus Visible (Level AA)

URL Where Issue Was Encountered:

https://www.theory.com/

Screen Capture Evidence:

https://askbizit.sharepoint.com/:v:/s/ADA/ESDfQ1SSGeFHi-DGVD7qGNIB87u0hPoyg4FJi462ShRTbQ


**Violation 7: 1.3.1 Info and Relationships**

Information, structure, and relationships conveyed through presentation can be programmatically determined or are available in text.

Description: After exiting the accessible carousel, the user encounters three consecutive promotional sections:  Summer, Captured – The screen reader announces two links: "Women's New Arrivals" and "Men's New Arrivals." However, it does not convey the promotional text above the links nor any description of the large background image. Women's Best Sellers – The screen reader announces "Women's Best Sellers" and "Shop Now," but provides no image context or supporting promo content.  Men's Best Sellers – Similar to the previous, the screen reader only conveys "Men's Best Sellers" and "Shop Now," with no description of the visuals.  None of these sections have visible focus indicators on either the banners or their associated links/buttons. Additionally, all imagery is purely decorative or lacks accessible descriptions, such as a woman modeling summer clothing or a man wearing featured products, leaving screen reader users unaware of what is being promoted.  Real-World Impact: Screen reader users miss out on critical promotional context, product imagery, and sales incentives that sighted users receive instantly. With no visible focus indicators, keyboard users may not even realize they're navigating actionable content. This exclusion makes it difficult to engage with or explore featured items, diminishing equal access to the shopping experience.

Applicable WCAG 2.1 Standard at Issue: 1.3.1 Info and Relationships (Level A)

URL Where Issue Was Encountered:

https://www.theory.com/

Screen Capture Evidence:

https://askbizit.sharepoint.com/:v:/s/ADA/EV1tQcDypmtPiyat16DgLJYB5axwsyv6y1ik

TSz1MDzfnw

**Violation 8: 2.4.3 Focus Order**

If a Web page can be navigated sequentially and the navigation sequences affect meaning or operation, focusable components receive focus in an order that preserves meaning and operability.

Description: In the second accessible carousel on the homepage, keyboard and screen reader users encounter a disjointed and misleading focus sequence, which prevents them from accessing critical product information.  When the user activates the "Next Slide" or "Previous Slide" buttons, the slide content updates, but the screen reader does not announce the new content.  After activating the navigation button and pressing Tab to continue, focus is sent to interactive controls like "Add to Wishlist" and "Remove from Wishlist", without first exposing the product name, description, price, or discount, leaving users unaware of what item they are acting upon.  The slide heading is only reached after these controls, and even then, price and promotional context are entirely omitted.  Similarly, after interacting with the "Next Slide" button, the next focus target is not the new slide content, but rather the "Close Carousel" button, skipping the product details entirely.  Real-World Impact: This broken focus order forces users to interact blindly with wishlist buttons before they know what product is being shown. The structure is disorienting, and the absence of clear context increases the likelihood of errors, such as adding the wrong item or missing out on important promotions.

Applicable WCAG 2.1 Standard at Issue: 2.4.3 Focus Order (Level A)

URL Where Issue Was Encountered:

https://www.theory.com/

Screen Capture Evidence:

https://askbizit.sharepoint.com/:v:/s/ADA/EW1JQrZxvJREtKOJPO7CvpQB00od3rlvop

UpDSgnqVIZGA


**Violation 9: 1.3.1 Info and Relationships**

Information, structure, and relationships conveyed through presentation can be programmatically determined or are available in text.

Description: The second accessible carousel on the homepage fails to convey critical content to screen reader users. While the slide visually changes to display new product details, including the product name, price, and any promotional discounts, this content is not programmatically conveyed. Upon activating navigation buttons like "Previous" or "Next Slide," the screen reader only announces "Slide X of 4," with no additional information about the slide's contents.  Inside each slide, after a few tab stops, the screen reader eventually announces the product name (as a heading level 2), but omits important contextual details such as the price and whether there is a discount or promotional offer applied. This results in users receiving incomplete information about the featured item.

Real-World Impact: Users relying on assistive technology cannot learn what product is being displayed, what it costs, or whether it's on sale, significantly impairing their ability to shop independently or evaluate offers.

Applicable WCAG 2.1 Standard at Issue: 1.3.1 Info and Relationships (Level A)

URL Where Issue Was Encountered:

https://www.theory.com/

Screen Capture Evidence:

https://askbizit.sharepoint.com/:v:/s/ADA/EZSucln-

6V5JhSpCPWahVLkBOTmNyi76MUW0kKeIQjyQIw

30)     Although the Website appeared to have an "accessibility" statement displayed and an "accessibility" widget/plugin added, the "accessibility" statement and widget/plugin, when tested, still could not be effectively accessed by, and continued to be a barrier to, blind and visually disabled persons, including Plaintiff as a completely blind person. Plaintiff, although she attempted to access the statement, thus, was unable to receive any meaningful or prompt assistance through the "accessibility" statement and the widget/plugin to enable her to quickly, fully, and effectively navigate the Website.

31)     The fact that Plaintiff could not communicate with or within the Website left her feeling excluded, as she is unable to participate in the same shopping experience, with the same access to the merchandise, sales, discounts, and promotions, as provided at the Website and in the physical locations as the non-visually disabled public.

32)     Plaintiff desires and intends, in the near future once the Website's access barriers are removed or remedied, to patronize one or more of Defendant's physical stores and to use the Website, but she is presently unable to do so as she is unable to effectively communicate with Defendant, due to her severe visual disability and the Website's access barriers. Alternatively, as a tester using screen reader software, Plaintiff is unable to effectively access, navigate, and communicate with Defendant through the Website due to her severe visual disability and the Website's access barriers. Thus, Plaintiff, as well as others who are blind and with visual

disabilities, will suffer continuous and ongoing harm from Defendant's intentional acts, omissions, policies, and practices as set forth herein unless properly enjoined by this Court.

33)   On information and belief, Defendant has not initiated a Web Accessibility Policy to ensure full and equal use of the Website by individuals with disabilities.

34)   On information and belief, Defendant has not instituted a Web Accessibility Committee to ensure full and equal use of Website by individuals with disabilities.

35)   On information and belief, Defendant has not designated an employee as a Web Accessibility Coordinator to ensure full and equal use of the Website by individuals with disabilities.

36)   On information and belief, Defendant has not instituted a Web Accessibility User Accessibility Testing Group to ensure full and equal use of the Website by individuals with disabilities.

37)   On information and belief, Defendant has not instituted a User Accessibility Testing Group to ensure full and equal use of the Website by individuals with disabilities.

38)   On information and belief, Defendant has not instituted a Bug Fix Priority Policy.

39)   On information and belief, Defendant has not instituted an Automated Web Accessibility Testing program.

40)   Defendant has not created and instituted an effective Specialized Customer Assistance line or service or email contact mode for customer assistance for the visually disabled.

41)   Defendant has not created and instituted on the Website a useful or accessible page for individuals with disabilities, nor displayed a link and information hotline, nor created an information portal explaining when and how Defendant will have the Website, applications, and digital assets accessible to the visually disabled or blind community.

42) The Website does not meet the Web Content Accessibility Guidelines ("WCAG") 2.0 Level AA or higher versions of web accessibility.

43) Defendant has not disclosed to the public any intended audits, changes, or lawsuits to correct the inaccessibility of the Website to visually disabled individuals who want the safety and privacy of purchasing Defendant's products offered on the Website and in the physical stores from their homes.

44) Defendant thus has not provided full and equal access to and enjoyment of the goods, services, facilities, privileges, advantages, and accommodations provided by and through the Website and their physical stores in contravention of the ADA.

45) Public accommodations under the ADA must ensure that their places of public accommodation provide effective communication for all members of the general public, including individuals with visual disabilities such as Plaintiff.

46) The broad mandate of the ADA is to provide an equal opportunity for individuals with disabilities to participate in and benefit from all aspects of American civic and economic life. That mandate extends to internet shopping websites such as the Website at issue in the instant action.

47) Defendant is, and at all relevant times has been, aware of the barriers to effective communication within the Website which prevent individuals with visual disabilities from the means to comprehend information presented therein.

48) Defendant is, and at all relevant times has been, aware of the need to provide full access to all visitors to the Website.

49) The barriers that exist on the Website result in discriminatory and unequal treatment of individuals with visual disabilities, including Plaintiff.

20

50)     Plaintiff has no plain, adequate, or complete remedy at law to redress the wrongs alleged

hereinabove, and this suit for declaratory judgment and injunctive relief is her only means to secure

adequate and complete redress from Defendant's unlawful and discriminatory practices in

connection with its website access and operation.

51)     Notice to Defendant is not required because of Defendant's failure to cure the violations.

52)     Enforcement of Plaintiff's rights under the ADA is right and just pursuant to 28 U.S.C.

§§2201 and 2202.

53)     Plaintiff has retained the undersigned attorneys to represent her in this case and has agreed

to pay them a reasonable fee for their services.


**COUNT I – VIOLATION OF THE ADA**

54)     Plaintiff realleges paragraphs 1 through 53 as if set forth fully herein.

55)     Pursuant to 42 U.S.C. §12181(7)(B), Defendant is a public accommodation under the ADA

and thus is subject to the ADA.

56)     Pursuant to 42 U.S.C. §12181(7)(B), the Website is covered under the ADA because it

provides the general public with the ability to view the products available at Defendant's locations,

purchase products through Defendant's website, subscribe to Defendant's newsletter, create an

account and register to track orders, create a wish list, and learn the story behind Defendant's

brand. The Website thus is an extension of, gateway to, and intangible service, privilege, and

advantage of Defendant's physical locations. Further, the Website also serves to augment

Defendant's physical stores by providing the public information about the stores and by educating

the public as to Defendant's brand and available products merchandise sold through the Website

and in the physical stores.

57)     Under Title III of the ADA, 42 U.S.C. §12182(b)(1)(A)(II), it is unlawful discrimination to deny individuals with disabilities or a class of individuals with disabilities an opportunity to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodation, which is equal to the opportunities afforded to other individuals.

58)     Specifically, under Title III of the ADA, 42 U.S.C. §12182(b)(2)(A)(II), unlawful discrimination includes, among other things, "a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages or accommodations."

59)     In addition, under Title III of the ADA, 42 U.S.C. §12182(b)(2)(A)(III), unlawful discrimination includes, among other things, "a failure to take such steps, as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services, unless the entity can demonstrate that taking such steps would fundamentally alter the nature of the good, service, facility, privilege, advantage, or accommodation being offered or would result in an undue burden."

60)     The Website must comply with the ADA, but it does not as specifically alleged hereinabove and below.

61)     Because of the inaccessibility of the Website, individuals with visual disabilities are denied full and equal access to and enjoyment of the goods, information, and services that Defendant has made available to the public on the Website and in their physical stores in violation of 42 U.S.C. §12101, et seq, and as prohibited by 42 U.S.C. §12182, et seq.

62)     The Website was subsequently visited by Plaintiff's expert in August and the expert determination was that the same access barriers that Plaintiff had initially encountered, as well as numerous additional access barriers, existed. Defendant thus has made insufficient material changes or improvements to the Website to enable its full use and enjoyment by, and accessibility to, blind and visually disabled persons such as Plaintiff. Also, when the Website was visited by the expert, although the Website appeared to have an "accessibility" statement and widget/plugin linked on and displayed from its home page, the "accessibility" statement and widget/plugin, when tested, still could not be effectively used or accessed by, and continued to be a barrier to, blind and visually disabled persons such as Plaintiff. Defendant furthermore has not disclosed to the public any intended audits, changes, or lawsuits to correct the inaccessibility of the Website to visually disabled individuals, nor has it posted on the Website an effective and useful "accessibility" notice, statement, or policy to provide blind and visually disabled person such as Plaintiff with a viable alternative means to access and navigate the Website. Defendant thus has failed to make reasonable modifications in its policies, practices, or procedures when such modifications are necessary to afford goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, in violation of 28 C.F.R. §36.302. The lack of a viable and effective "accessibility" notice, policy, or statement and the numerous access barriers as set forth in the Declaration of Plaintiff's expert, Mario Saavedra, attached hereto and the contents of which are incorporated herein by reference, continue to render the Website not fully accessible to users who are blind and visually disabled, including Plaintiff.

63)     More violations may be present on other pages of the Website, which can and will be determined and proven through the discovery process in this case.

64)     There are readily available, well-established guidelines on the internet for making Websites accessible to the blind and visually disabled. These guidelines have been followed by other large business entities in making their websites accessible. Examples of such guidelines include, but are not limited to, adding alt-text to graphics and ensuring that all functions can be performed using a keyboard. Incorporating such basic components to make the Website accessible would neither fundamentally alter the nature of Defendant's business nor would it result in an undue burden to Defendant.

65)     Defendant has violated the ADA -- and continue to violate the ADA -- by denying access to the Website by individuals such as Plaintiff with visual disabilities who require the assistance of interface with screen reader software to comprehend and access internet websites. These violations within the Website are ongoing.

66)     The ADA requires that public accommodations and places of public accommodation ensure that communication is effective.

67)     According to 28 C.F.R. §36.303(b)(1), auxiliary aids and services include "voice, text, and video-based telecommunications products and systems".    Indeed, 28 C.F.R.§36.303(b)(2) specifically states that screen reader software is an effective method of making visually delivered material available to individuals who are blind or have low vision.

68)     According to 28 C.F.R. §36.303(c), public accommodations must furnish appropriate auxiliary aids and services where necessary to ensure effective communication with individuals with disabilities: "In order to be effective, auxiliary aids and services must be provided in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability," 28 C.F.R. §36.303(c)(1)(ii).

69)     Part 36 of Title 28 of the C.F.R. was designed and is implemented to effectuate subtitle A of Title III of the ADA, which prohibits discrimination on the basis of disability by public accommodations, and requires places of public accommodation to be designed, constructed, and altered in compliance with the accessibility standards established by Part 36.

70)     As alleged hereinabove, the Website has not been designed to interface with the widely and readily available technologies that can be used to ensure effective communication, and thus violates the ADA.

71)     As a direct and proximate result of Defendant's failure to provide an ADA compliant Website, with a nexus to their brick-and-mortar stores, Plaintiff has suffered an injury in fact by being denied full access to, enjoyment of, and communication with Defendant's Website and its physical stores.

72)     Because of the inadequate development and administration of the Website, Plaintiff is entitled to injunctive relief pursuant to 42 U.S.C. §12133 and 28 C.F.R. §36.303, to remedy the ongoing disability discrimination.

73)     Pursuant to 42 U.S.C. §12188, this Court is vested with the authority to grant Plaintiff appropriate and necessary injunctive relief, including an order to:

> i.     Require Defendant to adopt and implement a web accessibility policy to make publicly available and directly link from the homepage of the Website to a functional statement as to the Defendant's policy to ensure persons with disabilities have full and equal access to and enjoyment of the goods, services, facilities, privileges, advantages, and accommodations through the Website and the physical locations.

> ii.     Require Defendant to take the necessary steps to make the Website readily accessible to and usable by blind and visually disabled users, and during that time period

prior to the Website's being made readily accessible, provide an effective alternative method for individuals with visual disabilities to access the information available on the Website until such time that the requisite modifications are made, and

iii.    Require Defendant to provide the appropriate auxiliary aids such that individuals with visual disabilities will be able to effectively communicate with the Website for purposes of viewing and locating Defendant's stores and becoming informed of and purchasing Defendant's products, and during that time period prior to the Website's being designed to permit individuals with visual disabilities to effectively communicate, to provide an alternative method for individuals with visual disabilities to effectively communicate for such goods and services made available to the general public through the Website and the physical stores.

iv.    Plaintiff is entitled to recover her reasonable attorney's fees, costs, and expenses pursuant to the ADA. To that end, Plaintiff has been obligated to retain the undersigned counsel for the filing and prosecution of this action and has agreed to pay them a reasonable fee for their services.

74)    WHEREFORE, Plaintiff requests entry of judgment in her favor and against Defendant for the following relief:

a.    A declaration that Defendant's website is in violation of the ADA;

b.    An Order requiring Defendant, by a date certain, to update its website, and continue to monitor and update its website on an ongoing basis, to remove barriers in order that individuals with visual disabilities can access, and continue to access, the website and effectively communicate with the website to the full extent required by Title III of the ADA;

26

c.      An Order requiring Defendant, by a date certain, to clearly display the universal disabled logo within its website, wherein the logo [1]would lead to a page which would state Defendant's accessibility information, facts, policies, and accommodations.  Such a clear display of the disabled logo is to ensure that individuals who are disabled are aware of the availability of the accessible features of the website;

d.      An Order requiring Defendant, by a date certain, to provide ongoing support for web accessibility by implementing a website accessibility coordinator, a website application accessibility policy, and providing for website accessibility feedback to insure compliance thereto.

e.      An Order directing Defendant, by a date certain to evaluate its policies, practices and procedures toward persons with disabilities, for such reasonable time to allow Defendant to undertake and complete corrective procedures to its website;

f.      An Order directing Defendant, by a date certain, to establish a policy of web accessibility and accessibility features for its website to insure effective communication for individuals who are visually disabled;

g.      An Order requiring, by a date certain, that any third-party vendors who participate on Defendant's website to be fully accessible to the visually disabled;

h.      An Order directing Defendant, by a date certain and at least once yearly thereafter, to provide mandatory web accessibility training to all employees who write or develop programs or code for, or who publish final content to, Defendant's website on how to

---

[1] 

conform all web content and services with ADA accessibility requirements and applicable accessibility guidelines;

i.      An Order directing Defendant, by a date certain and at least once every three months thereafter, to conduct automated accessibility tests of its website to identify any instances where the website is no longer in conformance with the accessibility requirements of the ADA and any applicable accessibility guidelines, and further directing Defendant to send a copy of the twelve (12) quarterly reports to Plaintiff's counsel for review.

j.      An Order directing Defendant, by a date certain, to make publicly available and directly link from its website homepage, a statement of Defendant's Accessibility Policy to ensure the persons with disabilities have full and equal enjoyment of its website and shall accompany the public policy statement with an accessible means of submitting accessibility questions and problems.

k.      An award to Plaintiff of her reasonable attorney's fees and costs pursuant to in 42 U.S.C. §§12181-12189, and pursuant to such other laws and statutes that may apply, and further relief as the Court deems just and equitable.


**COUNT II – TRESPASS**

Plaintiff realleges paragraphs 1 through 53 as if set forth herein.

75)     Defendant's website contains software analytics. Since Plaintiff has navigated Defendant's website as stated herein, Plaintiff's computer and the personal information and browsing history stored therein, has suffered a trespass by Defendant.

76)     Plaintiff never consented to and was unaware that Defendant's website was placing software on her computer.

77)     The "pop-up" or banner notice that appears on Defendant's website does not properly audibilize the cookies policy in a way where a visually disabled person like the Plaintiff can properly understand or give informed consent to allow tracking cookies to be placed on her computer.

78)     Defendant committed common law trespass in violation of Florida law against Plaintiff because Plaintiff did not consent to the placement of tracking and information securing software on her personal computer, which was done without her knowledge and consent.

79)     Defendant's trespass has damaged Plaintiff by affecting the condition and value of her computer.

80)     On its website, Defendant has an internet privacy policy section that can only be accessed by clicking a barely visible section at the bottom of the page called "Cookies Policy", providing that they use cookies and similar technologies to collect a consumer's information and they obtain non-public information from their users for their own advertising and marketing purposes by placing software on its website that collects a website user's preferences and internet browsing habits as follows:

COOKIES

We receive and store certain types of information whenever you interact with us.

When accessing our website, information about your browsing may be saved in some "cookies" files installed on your device.

We issue these cookies to facilitate navigation on our website.

They can also be issued by our providers in order to offer you personalised advertising when you access other websites.

In addition, some cookies may be on different areas on our Site, displaying advertising content from third-parties advertisers on your device.

Please note that only the issuer of a cookie may read or modify information contained therein.

Cookies we issue

Cookies we install on your device allow us to recognize your browser when you connect to our website.

We issue cookies for the following purposes:

•   Establish traffic statistics (number of visits, page views, abandonment during the order process) to monitor and improve the quality of our services;

•   Adapt the presentation of our website to the display preferences of your terminal;

•   Memorise information entered in forms, manage and secure access to specific and personal places such as your account, manage your shopping cart. We may send you e-mails to keep you informed of the status of your order: you can unsubscribe at any time by clicking on the unsubscribe link in each email;

•   Provide you with content, including advertising, related to your interests and customise the offers we send you;

•   Theory uses cookies to collect information around abandoned shopping carts. A cart is considered abandoned after 30 minutes of inactivity/lack of purchase. Once the timer has expired an SMS message will be sent as a reminder.

Third-party cookies

When you access our Site, one or more cookies from our providers ("third-party cookies") may be placed on your device via the pages of our website or via content displayed in our advertising spaces.

The cookies placed on our website by the providers we use to promote our activities and our offers are designed to:

• Identify the products seen or purchased on our website in order to personalise the advertising offer sent to you when you access other websites;

• Send you Theory offers by email if you have authorized them when registering.

The cookies contained in the advertising spaces of our website are intended to establish statistics on advertisements (such as how many times it was displayed, which advertisements were displayed, number of users having clicked on each advertisement ...)

81)     Due to Plaintiff's disability, she could not understand Defendant's website and she could not give informed consent to Defendant's installation of data and information tracking software on her computer.  Defendant also could not give informed consent to Defendant's collection of her browsing history and the placement of analytics on her computer.

82)     Thus, Plaintiff has no adequate remedy at law to redress Defendant's knowing and reckless disregard for Plaintiff's right to exclude others from her computer and determine which programs should be installed and operated on her computer.


WHEREFORE, Plaintiff demands judgment against Defendant for Plaintiff's damages, interest, costs, and such further relief as the Court deems just and equitable.

Submitted by:

Mendez Law Offices, PLLC
Attorneys for Plaintiff
P.O. BOX 228630
Miami, Florida 33172
Telephone: 305.264.9090
Facsimile: 1-305.809.8474
Email:info@mendezlawoffices.com
By: _____/s/_____
DIEGO GERMAN MENDEZ, ESQ.
FL BAR NO.: 52748

Adams & Associates, P.A.
Attorneys for Plaintiff
6500 Cowpen Road, Suite 101
Miami Lakes, FL  33014
Telephone:  786-290-1963
Facsimile:  305-824-3868
Email: radamslaw7@gmail.com
By: _____/s/_____
RICHARD J. ADAMS, ESQ.
FL BAR NO.: 770434